BnocKEsamoiJfiH, J.
There is nothing in the record to shew, how far by the laws or established usages of North Carolina, an attorney at law who has possession of the specialty of a client, may bind him by a settlement of the debt with the debtor; nor does the answer of the defendant who had dealt with the plaintiffs in Virginia, suggest any difference between the law of that state and of this, in this respect. I shall therefore inquire, how the common law and our own law stand on this subject. The cases of Hudson v. Johnson, and Branch v. Burnley, establish the proposition, that an attorney at law who has possession of the evidence of debt, or has obtained a judgment for his client, may receive from the debtor payment of the debt, and that the creditor having confided in him not only to sue if necessary, hut also to collect and receive the money, is bound by the payment. They place the attorney at law on the footing of an agent delegated to receive money. *286 Now, such an agent cannot vary from his authority, by i'eceiving a bill or note, instead of money, or of that which according to the course of trade is current as money. Paley on Agency 220. Ward v. Evans, 2 Ld. Raym. 930. Salk. 442, S. C. Nor can even a general agent, without particular authority, commute the payment by receiving another thing, as a horse &c. in discharge of the debt,'unless it be delivered over to the employer who agrees to it. Paley 221. This was also laid down by the general court in Smock v. Dade; where it is also said, that the attorney at law- who gave a receipt or acquittance for the money, represented the debtor and not the creditor. I do not quote this case as authority, but I consider it as a good decision. The modern case of Russell v. Bangley is a strong one to prove, that if the agent, instead of receiving money, gives to the debtor credit for money which he himself owes to the debtor (or, as it is expressed, “ writes off money due from him to the debtor”), then the debtor is not discharged.
If is admitted, however, that acquiescence on the part of the principal will be proof of consent on his part, and that will make the act of the agent the act of the principal. Salk. 442. Then the question is, whether, in this case, there was such acquiescence alleged and proved ? I think not. The plaintiffs have not admitted by their pleadings, nor is there any proof of, actual consent. But it has been inferred that there was such consent, from the circumstance that the plaintiffs paid' some of the costs incurred in ,the suit brought on the bond which Glenn the attorney took from Holloway in discharge of his bond. It is to be remarked, that the answer of Holloway does not put his defence on the ground of the acquiescence of the plaintiffs, but relies on the authority of the attorney to make the arrangement which he did make. I do not think that the court ■ought to supply his deficiencies, and furnish him with *287 a weapon which ho did not choose to wield. If he had thought proper to rely on acquiescence, the plaintiffs might have given circumstances in evidence, which would have led irresistibly to the conclusion, that they did not agree to take the bond of Thompson and Scott in satisfaction of Holloway’s debt to them ; and that although they were willing to wait to see whether any thing could be made from the suit against those obligors, and for that purpose to pay the costs, yet that they did not ratify the act of Glenn, who in that matter acted rather as the agent and attorney of Holloway, than of themselves.
As to the statute of limitations, I think it will not apply to the present case. It seems sufficiently clear, that the paper which Holloway executed to the plaintiffs wa.s a sealed instrument. The bill says, that the plaintiffs sent to llujjin an open account claim against the defendant Holloway, and that llujjin put the claim into the hands of Glenn an attorney, that one of them bonded the account, and that Glenn held the bond. The defendant denies that the account was sent on to Rvjjin, and affirms that he himself executed to one of the plaintiffs the note in question, and that the note, instead of the account, was sent to Rujjin. The note in question ought to be understood to mean the bond which the plaintiffs mentioned in their bill; especially as the defendant had possession of the instrument, and if it was a mere note of hand, and not a sealed instrument, might have produced it, and shewn its real character. Again, the defendant describes the paper which he transferred to Glenn as being a note ; that paper happens to be in the record, and is clearly a sealed instrument. Hence, I infer, that the other was a sealed instrument likewise; and if so, the act of limitations does not apply. But if it was a note of hand, the 14th section of the statute of limitations will prevent that, statute from operating as a bar.
*288 On the whole I am of opinion, that the decree of the superiour court of chancery should be reversed, and that of the county court affirmed. J
Carr, J.
In the view I take of this case, the statutes of North Carolina, putting bonds, notes, &c. on the footing of inland bills of exchange, are wholly unimportant.
As to the statute of limitations, I question whether it would apply to the cáse, even between citizens of the commonwealth; since I incline to think, that we must take the debt from Holloway to Wilkinson Co. to have been? due by bond. It behooved the pleader of the statute, to make out a case to which it clearly applied: and I think no one could say he has done this, even if this was a case between residents. However, I have not much examined that point; because I think it clear, that the plea cannot be sustained, on another ground. If we may credit the defendant’s answer, (as according to the rules of evidence, we must), the cause of action accrued in Virginia. He says, the plaintiffs did not send their account to Ruffin, but he executed the note in question to the plaintiff Henry Wilkinson in person, and that the note, instead of the account, was sent to Ruffin. This allegation, positive and responsive, and not contradicted, by any evidence, is decisive, that the note or bond (whichever it was) was executed here. If so, the proviso of the 14th section of the statute of limitations applied a fortiori to the defendant, who left Virginia as soon as he had executed the instrument, and resided in North Carolina; thereby -obstructing the plaintiffs’ action. Neither could it have been brought when it was, but for the accidental circumstance of the defendant having debts due to him in Virginia. It surely does not lie with persons so situated, to avail themselves of the statute; especially in equity, where it is applied not as positive law binding the court, but *289 by analogy. It was said, that if the plaintiffs meant to t , . . . . . rely on the proviso of the 14th section, they ought to have replied the matter in avoidance, specially. But the counsel did not, at the moment, reflect, that special replications, with all their consequences, are now out of use, and the plaintiff is to be relieved according to the form of his bill, whatever new matters may have been introduced by the defendant’s plea or answer; Mitf. Plead. 256. and that now, a decree in equity cannot be reversed for the entire want of a replication to the answer, by our statute of 1827-8. Supp. to Rev. Code, ch. 96. § 1. p. 125.
Then the question is, as to the arrangement made by Glenn with the defendant, taking in part discharge of Hollowatfs bond to the plaintiffs, a debt due from himself to Holloway, and for the balance, a, bond of Thompson and Scott to Holloway. Was this transaction binding on the plaintiffs ? 1 understood the appellee’s counsel in his argument to take the position, that the possession of a bond does, of itself, empower the holder to discharge it by any contract he may choose to make with the obligor. Taken thus broadly, I should think the proposition plainly unsound and mischievous. Considering Glenn, first, as an agent to collect, had he power to bind his principal by the contract he made P The authorities are, to my mind, perfectly clear and decisive, that he had not. The cases of Tonkin v. Fuller, Guerreiro v. Peile, and Russell v. Bangley, cited at the bar, ■were decided upon principles plainly applicable to the question. [Here, the learned judge stated the particular circumstances of those cases, and the points presented and decided.] To those authorities I shall add a reference to one or two of older date, which are to the same purpose. Thus, in Doct. & Stud. Dial. 2. ch. 42. pp. 237, 8. it is laid down, that even a general agent cannot, without particular authority, commute the payment by receiving another thing, ás a horse &c. in dis *290 charge of a debt j unless it be delivered over to the em- .. 7 T . ployer, who agrees to it. bo, m Evans v. Ward, 2 La. Raym. 930. 2 Salk. 442. Ward sent his servant with a note of £ 50. to his debtor, to receive the money; the with the servant to Evans’s shop, who indorsed off £ 50. from a note of £ 100. which he owed the debtor, and gave Ward’s servant a note for £ 50. upon one Wallis, a goldsmith, which was presented the next morning, but payment was refused, and Wallis broke that day; the note was returned to Evans, who refused to pay it, and this action was brought to recover it: the court held, that Ward was not bound by this conduct of his servant; lord Holt saying, that “ when a servant is sent to receive money on a bill, he cannot accept a note instead of money, without the particular directions of his master.” All these authorities apply with double force to the case of an attorney at law. When a man has debts outstanding, his first object is to collect them in the quickest and cheapest mode; and he either applies himself, or employs some agent to go around to his debtors, to get the money or money’s worth. If this effort fails, his last resort is to collect them by process of law; and then he goes to the lawyer, and deposits them with him—for what? to commute them for land, or horses, or slaves, or other bonds, or to pay the lawyer’s own debts ? No, so far from it, that the universal understanding is, I believe, that it is not a duty of the lawyer even to apply to the debtor; he may and often does do it, from a disposition to be civil; but very often also, he taires them to the clerk’s office, and issues the writ at once. So much was he considered the mere instrument of the law to enforce the payment to the client, that the question in our early cases, was, whether he was authorized to receive the money himself, under any circumstances. But I have never seen a case, nor heard an opinion, that he was clothed with power to use the bond as if his own pro *291 perty, exchange it for other property, or pay his own % i • i • tvt x if ■ , , , debt with it. JNor can I well conceive, how a debtor can, without actual fraud, deal in this way with an atlorney, whose only evidence of power is the possession of the bond. Look at the case of an executor: he is so far the representative of the testator, that he has the legal title to the personalty; yet, because he is a fiduciary, any individual creditor of his own, who receives in discharge of his debt, assets of the estate, knowing them to be such, or whoever deals with the executor for any of the assets, in any way which makes him a party to the breach of trust, must account for such assets to those who are entitled under the will. Graff v. Castleman, 5 Rand. 195. Here, the defendant in his answer, explicitly states his knowledge that the note was placed in the hands of Glenn for suit or collection : how then could he, without participating in the fraud of Glenn, assist him in abusing his trust so far as to apply a part of that note to the payment of his own debt to the defendant, and to receive from the defendant for the balance, a bond worth (so far as we can judge) not one cent ? I sa.y so, because upon a suit brought in good time and diligently prosecuted, the return was no effects. Observe too, how this bond was transferred: there was no assignment to the creditor, but a blank indorsement, to be filled up as the attorney pleased, and in fact filled up to one Young. The property in this bond, then, was never in the creditor. Can a debtor thus discharge an honest debt ? Can he, thus knowing, thus aiding, thus taking advantage of, this gross breach of trust, extinguish his obligation ? I answer, confidently, no—unless the creditor has, by some unequivocal act, sanctioned the transaction; some act, shewing that with a full knowledge of the circumstances, he had assented to take in satisfaction of the debt due him from Holloway, the bond of Thompson and Scott, and Glenn’s debt.
*292 What is the evidence of such assent ? The answer n . • , does not charge it, but, on the contrary, rests the matter wholly on the power which the possession of the note for suit, gave Glenn over it ,• adding, that if he has jmp0se(j on the plaintiffs, it is their misfortune to have trusted an unfaithful agent. There are no letters from the plaintiffs ; no proof of any communication between them and Glenn on the subject. The barter took place in 1819, and in February 1821 (not longer probably than 18 months after) there was a return on the execution for Thompson and Scott's debt, of nulla bona. Within this time, we do not know that the plaintiffs ever heard of the transaction; and being in another state, we may well suppose that they did not; especially as the bond was not assigned to them, but to one Young, and the suit in his name. If they had not heard of the exchange before, it is hardly imaginable that, after this return had ascertained the worthlessness of the bond, they would sanction it, unless (in ignorance of their right) they might believe they had no power to disavow it, and look still to their debtor. But it is said, that the plaintiffs have paid the costs of the suit on the assigned bond, and thereby ratified the exchange and given up their claim on Holloway. It is clear, that this act does not of itself amount to a release of Holloway: it is at best but a fact on which to found an inference. That the plaintiffs did not understand it to be a release, is very evident; for we find no trace of the fact except in their bill; and there it is brought forward as a ground of additional claim against Holloway, not a release of the old claim. But taken in itself, Ido not think the isolated fact authorizes the inference, especially when we are to draw it in favour of one who is confessedly a party to the fraud practised on the plaintiffs. But suppose it were in proof, that the plaintiffs had been informed of this unauthorized act of the attorney, and had so far acquiesced as to await the issue of the suit *293 on the bond: 1 bold, that even this would not have re- • • • leased the original debtor. For this I might cite several cases; but one will suffice; I mean Russell v. Bangley, beibre referred to. There, the underwriter settled the loss upon the policy to the broker’s satisfaction, though not by the payment of actuaL money; the broker informed the assured of this settlement; and in the account sent, made himself debtor to the assured for the £ 150. the amount of the loss; and the assured so far sanctioned this arrangement that he drew a bill of exchange on the broker at two months, which was accepted ; but as the broker failed, soon after it grew due, without paying it, the assured sued the underwriter: and, by the opinion of the whole court, recovered. The opinions shew the ground on which the judges placed this point. Bayky said—“ The fact of the assured taking Savenfs (the broker) bill, was nothing more than an agreement to accept payment in that way, if it should be ultimately available. If the defendant had meant that the money should be paid by bill, he should have sent that bill to the assured, or he should have pledged his own credit in some respect.” Holroyd said, “In this cáse, the policy having been placed in the hands of the broker, an account is made out, shewing how much was duo from the assured to the broker on one hand, and from the broker to the assured on the other; and in that account the broker slates the amount of the loss in question to be a sum due from him to the assured. It was, however, in fact, due from the underwriter. For the balance of that account, the assured drew a bill on the broker, which was accepted by the latter, but not paid in due course, and that without any default of the assured in endeavouring to obtain payment. This being so, I cannot distinguish this case from those in which it has been decided, that receiving a bill from a third person is not a satisfaction of a debt, in case the bill be not eventually paid, unless *294 there be some default in the holder.” Best said, “The . , , . . . broker was only authorized to receive payment m money. The defendant has settled the loss with the broker; that is, the amount due to the plaintiff has been ascertaine(i between them, and the broker accepted a bill for the same. Before, however, the giving of a bill of exchange by a third person can discharge an original debtor, it must be shewn that the person taking that bill agreed to accept it in full satisfaction. There is no such agreement in" this case.” This case, I think, goes very far beyond that before us.
I am of opinion that the decree of the superiour court of chancery be reversed, and that of the county court affirmed.
Cabell, J.
There is no difficulty nor doubt as to the principles of law applicable to this case. It is perfectly clear, on common law principles, that an attorney at law, as such, has no authority to set off a debt due from himself against a debt due to his client, nor to commute the bond of his client put into his hands for collection, for any other bond. And it would be a work of supererogation to attempt to enforce what has been already said on this subject.
But although the acts of the attorney in relation to the bond in question were not originally binding on the appellants, yet they may have become binding by their subsequent ratification. And the only question in this case is, whether there has been such ratification. This is a question of fact, to be determined by the evidence. I think there is no sufficient evidence to establish the fact. There is no positive proof whatever on the subject ; and the only circumstance, that can be relied upon as affording a presumption of the fact, is the payment by the appellants of the' costs of the North Carolina suit, on the bond which their attorney Glenn had taken, in lieu of" the bond originally -entrusted to him. But al *295 though we may fairly infer, from the payment of these costs, that the appellants were willing to make an effort to get payment of their debt by means of that suit; yet it would be unwarrantable to infer a total'abandonment of their claim against Holloway, in case that effort should fail. For, the evidence does not disclose one word, nor one act of omission or commission, on the part of the appellants, from which we can justly infer such an abandonment, except the fact of the payment of the costs: and that fact is satisfactorily accounted for by the consideration before mentioned.
This view of the subject puts an end to the question as to the statute of limitations. For the claim of the appellants against the appellee is still for their original debt, due by bond, to which the statute is not applicable.
I concur in the opinion to reverse the decree of the chancellor and to affirm that of the county court.
Brooke, J.
I also approve the decree of the county court. Glenn, the attorney, who derived his authority from Ruffin, and was unknown to the plaintiffs, had no other power but that of collecting the debt due them from Holloway. Glenn held the note (or bond) of Holloway, which Holloway acknowledges in his answer was the evidence of his debt to the plaintiffs, not their open account against him, as is stated in the bill. With them Glenn had no direct communication; and though, if he had received the money and paid it over to them, there would have been no objection to his agency, yet until that was done, they might acknowledge him as their agent or not, as suited their own interest. There is nothing to show any authority given to Ruffin, to whom the collection of the debt had been committed, to transfer the collection of it to Glenn. But if there had been, it was a fraud in Glenn to collect a part of it by the payment of his own debt to Holloway, and take the as *296 signment of Thompson and Scott's bond for the balance. Upon principle, Glenn became Holloway's agent to collect that assigned debt, not the agent of the plaintiffs. Neither do I'think that the plaintiffs, by stating in their tpe procee(jingg to recover the assigned debt, and that they had defrayed the costs of that suit, ratified Glenn's acts, or even adopted him as their agent. They only waited to see whether their money could be got by the suit against Thompson and Scott: but they had no communication with Holloway on the subject, tending to shew their satisfaction with the arrangement he and Glenn had made. The setting off of Glenn's debt to Holloway against Holloway's debt to the plaintiffs, was a fraud in which Holloway participated. The patience of the plaintiffs, in waiting to see whether the money could be made by the suit against Thompson and Scott, cannot be held a ratification by the plaintiffs of Glenn's arrangement with Holloway, without denying the correctness of the decision in Russell v. Bangley, which, as my brother Carr has shewn, is a direct authority to the point, and a stronger case than this. As the debt of Holloway to the plaintiffs was contracted in Virginia, and he soon afterwards went or returned to North Carolina, and has resided there ever since, I cannot see how he can avail himself of the statute of limitations.
Tucker, P.
I cannot agree that the possession of a bond or other documentary evidence of debt, is such an evidence of property as will justify a payment to the holder, without an authority express or implied from the true owner. At common law, the property in these choses in action could not pass, even where they were actually assigned and delivered; an equity only was acquired by such assignment, and of course could never exist except where value was paid. By our law, assignments are permitted; and a transfer even without assignment, is held to pass the right of property. *297 But to such a transfer two things are necessary; 1. con- ... . „ . ,. ,. T . sidcration, and 2. the act oí transfer, it is not a more delivery of the possession without intent to pass the property, that constitutes the transfer. There must be an intent to transfer, and if there is no such intent, the holder has no right of property; he has no right to sell; nor has he a right to receive payment from the debtor, unless by authority express or implied. Every consideration that applies the principle of caveat emptor to the case of sales of property by one having possession without title, has additional force in the case of bonds and other chases in action; and, accordingly, the courts have uniformly decided, that as to them the rule caveat emptor applies. An exception, indeed, has been made in respect to money and bank notes, and even bills of exchange payable to bearer, acquired fairly in the course of business, which are universally treated as money, and which it is necessary for the purposes of commerce and the convenience of society should circulate freely and without obstruction. This distinction between money and documentary evidences of debt, is clearly stated in various cases. Myers & Son v. Friend, 1 Rand. 12. Wilson v. Rucker, 1 Call 500. Wookey v. Foie, 4 Barn. & Ald. 1. 6 Eng. C. L. Rep. 323. If, then, the possession of a bond is not such an evidence of property as to make valid a sale by the holder, it is not perceived how a payment to him can be deemed valid, and a satisfaction of the demand, unless upon the express or implied authority of the agent to receive. If a suit be instituted upon a bond not assigned, it must be in the name of the obligee, and the judgment and execution follow the writ. When the sheriff makes the debt, he must pay it into court, unless he takes the responsibility of paying it to the creditor. If he pays to any other than the obligee, it is on his responsibility also; and if he pays it into court, it never would be ordered to be paid over to any other person than the *298 obligee himself, unless the court was satisfied of the title of such person to receive it. Neither is the mere possession of a bond sufficient evidence of authority to receive. It is a fact too equivocal in its character, to justify, any action upon the strength of it. He who pays to any other than his creditor, ought to be assured by some more unequivocal evidence that payment is authorized. The possession of a bond, by an attorney furnish.es, indeed, a strong presumption of authority to receive ; but that presumption may be contradicted, and if satisfactorily contradicted, the. payment will be void. If it was placed in his hands by the obligee for collection, the ordinary course of business, the common custom of the country, will justify a payment to him. But it justifies a payment only, not a transmutation of the debt for the payment and satisfaction of the attorney’s own debts, or in exchange for property or other documentary evidences of debt. An authority to collect, is not equivalent to an authority to secure a debt in any way the agent may think fit. The former only authorizes the receipt of money, or of what is considered money. The latter will authorize the taking assigned bonds or other documentary evidences of debt in payment. Such, I am persuaded, has been generally deemed the principle applicable to transactions between attorneys and their clients, with us. The attorney who merely receives a bond for collection, does not consider himself as entitled to receive other paper in discharge of it, unless expressly authorized by his client. If, indeed, he perceives that such an arrangement is essential to his client’s interest, he may enter into it, subject to his ratification or rejection; or he may even enter into it and take the chance of ratification, where the course is plainly and obviously for the client’s advantage. Yet even then, his principal may repudiate his act.
.1 have said thus much on these, topics, because I would be unwilling by silence to seem to accede to the *299 very broad and sweeping propositions advanced in the , argument. In my opinion the case itself does not require their aid. The agency of Glenn has been abundantly recognized and confirmed by the plaintiffs. In the first instance, Glenn converted the open account into a specialty; which, by the bye, was, I presume, within his agency. He then discounted a part of the demand, by a debt of his own to the defendant, and received a bond for the residue. Did the plaintiffs know of the arrangement ? Their bill proves they did; for they recognized the suit brought for their benefit, and paid off the fee bills which grew out of it; and that voluntarily, for the payment of those fee bills could not have been enforced. Did they suffer the transaction to remain ten years without knowing what had been done ? It is not credible. If they did know, did they at once announce to the defendant that they disclaimed the agency ? that they would look to him and he must take care of himself? It is not pretended. With what justice, then, can they now throw back upon him the bond which has been prosecuted as their own by their acknowledged attorney ? With what justice can they now disavow an arrangement, the benefit of which they would have taken, had it turned out successfully ? The agency of their attorney has been ratified by their acquiescence, even if unauthorized at first. For, though the agent exceed his authority, yet his act may be ratified subsequently, and that ratification may be presumed from acquiescence. 4 Bac. Abr. Master and Servant. K. p. 586. As, if a master sends a servant to receive money, and instead of money he receives a bill, the master may as soon as he knows of it dissent, and will not be bound by the payment; but acquiescence, or a small matter, will be proof of the master’s assent, and that makes the act of the servant the act of the master; per Holt, C. J. in Ward v. Evans, 2 Salk. 442. Thorold v. Smith, 11 Mod. 87. 2 Stark. Law Ev. part *300 4. p. 58. In- this case, I think the evidence of acquiescenpe and i'atification full and satisfactory, and, therefore, that the original debt was discharged.
Therefore, the only question now is, whether the defenciant liable as assignor ? And on this question, I am of opinion, that due diligence was used by the plaintiffs for the recovery of the amount of the assigned bond, and that upon the return of the execution no effects, a complete right of action accrued to them. Unluckily for them, however, the period at which their right accrued is so remote that their recovery is now barred by our statute of limitations, within none of the exceptions of which have the plaintiffs brought themselves. From the facts appearing in the record, it would seem that the defendant was indeed an inhabitant of North Carolina; but the cause of action arose in that state, and the defendant resided there, when it arose. Now the statute only saves the right of the plaintiff in an action in our courts, where he himself is a non-resident, and not where the defendant is ,• for the defendant ought to be sued where he resides. The only exception in the statute founded upon the locality of the defendant, is to be fouin^ in the 14th section. But that can have no application here, since there can be no pretence that the defendant has absconded or concealed himself, or defeated the plaintiffs’ action, by removal, from the country. The defence of the statute, then, is unanswered.
My own opinion is, that the decree of the superiour court of chancery ought to be affirmed.
Decree of the superiour court of chancery reversed, and decree of the county court affirmed.